08-3037 et al. United States of America v. Gregory Bell, also known as Boy Boy, also known as Bunga, Appellant. Trial Issue 1, Ms. Englert for the Appellant, Mr. Perez for the Appellee. Trial Issue 2, Ms. Englert for and as well as Trial Issue 3, Ms. Englert for the Appellant, Mr. Perez for both Trial Issue 2 and 3. And for Sentencing Issues, Mr. Becker for the Appellant, Mr. Strand for the Appellee. All right. Thank you. Let me thank counsel for being here and being willing to go forward out of turn. Thanks a lot. Go ahead. Good morning. May it please the Court. I'm Cecilia Englert and I'm here on behalf of David Wilson, the Appellant. Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have. Those are the words of the Supreme Court in United States v. Cronin. What does it mean to be represented by counsel? It's more than having a warm body sitting next to the accused, a warm body with a law degree sitting next to the accused. The Sixth Amendment guarantees the effective assistance of counsel. When David Wilson's lawyer, Jennifer Wicks, became ill, the trial court, forcing Gary Proctor to take over, denied Wilson the effective assistance of counsel. There are multiple reasons why Cronin's presumed prejudice standard should apply. This was a long, complex trial expected to last nine months. Mr. Proctor was inexperienced in several cases at that time. He represented that he could not effectively represent Mr. Wilson, could not effectively take over the defense case. And, importantly, there were the circumstances of Mr. Proctor's appointment. He was appointed for this long, complex trial, 11 days before the trial. And, actually, what had happened before that, Ms. Wicks had to take over as lead counsel a few weeks before the trial. So she was scrambling to find somebody who could help her. Mr. Proctor agreed on the condition that he could still maintain his own trial cases and that he, because of the circumstances, had more of a mentality of a law clerk helping Ms. Wicks rather than full trial counsel. And one of the most significant factors that I would like to focus on, especially emphasize for the purpose of this argument, is the fact that Mr. Proctor was absent for a significant portion of the trial. The government says that the trial court never made any findings about that. Mr. Proctor represented that he had missed about a third of the trial. Is it true that the trial court never made any findings about that? And did the government ever contest that representation? It was not contested. There was a, I would say that at the June 27th hearing, this was the second hearing after Ms. Wicks became ill, Mr. Proctor made some representations to the court. In June, he said that he was there on June 5th, 6th, 7th, 11th, 12th, and 18th. Nobody, and he estimated, did a rough estimate that he was there for about two-thirds of the trial. It was not contested. And I will say as an aside, I don't think it's necessary to apply presumed prejudice, but extrapolating from those days that he said he was there, he missed June 13th, which was an entire day on the Middleton and Bradley murders. He missed part of Torn Scott's testimony, and he missed all of Renee Cottingham's testimony for that day. All right. Now, when the district judge first changed his mind and said we're going to have a break in the trial and then he's going to have time to prepare the defense, were the transcripts available to him? Proctor? I believe they were, from the way they were speaking on the record, that Mr. Proctor could read the transcripts for the trial date that he missed. Is that what the court's question is? That's right. I believe he had access to the court's transcripts for the trial date that he had missed. And did he, when the defense finally started, did he put anything on the record about his preparation or lack thereof? Did he say whether he was confident to go forward? Did the judge ask him about that? I don't remember specifically when the trial started up again. I think there is a lot on the record that he had put on the record before the trial court made the ruling, and the district court specifically found that Mr. Proctor had preserved his objection. Okay. How do you think we should handle this circumstance where you have counsel but the counsel becomes ill or unable to continue? Would your position be that you would always have to start over? You would have a missed trial in that case? That there would be no way for a new counsel to become prepared? I don't think that it is necessary to have a bright-line rule or per se rule in this case. This is not the case where you have two counsel who have worked the case up from the beginning, like suppose Ms. Tadkish and Ms. Wicks had been counsel from the beginning, and Ms. Wicks, you know, is out for a five-minute bathroom break and misses some of the trial. I'm not saying that in that circumstance that there should be presumed prejudice, but that is not the case. There are so many factors in this case. And something I would like to get to before time runs out is the fact that Mr. Proctor, you know, whether you say it's a third of the trial, it may have been a little more, it may have been a little less, but it was certainly a significant part of the trial. And I would refer to the court for the sweeping counsel cases. In Verdine v. Johnson, that was a Fifth Circuit case, that court said that unconscious counsel does not analyze, object, listen, or in any way exercise judgment on behalf of a client. But are you arguing that someone who has to read the transcript because they missed some portion of the trial would never give adequate representation? Again, I would not say that never. I would say that certainly in this case, where Mr. Proctor missed many trial days, and certainly an entire day where there were witnesses on the murder that Mr. Wilson was convicted of, that certainly in that case, that chronic suing prejudice standard should apply. And let me say that by missing, Mr. Proctor missing these trial days, he wasn't able to judge the credibility of the witnesses or see how the jury received the evidence. So much of counsel's judgment rests on how they evaluate what has been presented. Did the witness look honest? Did they smirk? Were the jurors paying close attention? Did they start taking notes? How important was this evidence? And when counsel has, for the defense case, perhaps some piece of evidence that they want to get out that's good for the defense, but there might be something bad about that witness, there's a judgment that has to be made. And that judgment has to be based on what was observed and what counsel could see about the government's evidence. What, if anything, is in the record about Mr. Proctor's ability to consult with Ms. Wicks during the time period that he's, well, after he's appointed and throughout the trial? There's no, nothing in the record about consultation throughout the trial. In the beginning, when the trial court was trying to assess what the defense, how long the defense case might be, he was asking Mr. Proctor and Mr. Davies at that point, they really couldn't give the court a good idea of how long the defense case was because they were so unprepared to do this, that the court suggested that they consult Ms. Wicks at least to get an estimate of what, how long the defense case might be. I think that there was some, that indicates that there was perhaps some limited, they could make some limited phone calls to Ms. Wicks, but there certainly was not any indication in the record that during the trial, that she was, attended the trial or was able to consult with Mr. Proctor. And the court, the district court did not base its finding on the, assuming that Ms. Wicks would be available to assist. And getting back to the, there were also examples within this case. There was one example Mr. Proctor brought up that the government had said, well, Mr. Proctor can do this. He's been, he served some subpoenas the other day and Mr. Proctor said, that's true, but he can't do this. That's true, I served some subpoenas. That's because Ms. Wicks asked me to serve these subpoenas. I don't know who these witnesses are or what, what she wants them for. This shows two things. Number one, Ms. Wicks is making judgments by watching the government's witnesses, informing the defense case as the government case is proceeding, number one. And number two, that Mr. Proctor was not privy to her decisions and her judgments. And so, for all of the factors that I indicated, chronic presumed prejudice should apply in this case. Mr. Proctor just did not have all of the information that he would need to exercise his judgment in the defense case. All right, we'll give you a minute to reply. Mr. Perez? Good morning, Your Honor. James Perez on behalf of the United States. Without pointing to a single instance, not one mistake on Mr. Proctor's part in this case, the defendant, excuse me, the appellant, Appellant Wilson, asked this court to nonetheless presume that Mr. Proctor made a mistake, at least one mistake or numerous mistakes, and to presume that there was prejudice in this case. This court should reject that argument for five distinct reasons. Five reasons why this case takes it out from any other case that the defendant cites in history. Number one, there's no dispute that Mr. Proctor was on this case at the beginning of the case. And what I mean by the beginning of the case, the beginning of the trial. February 2nd, the trial he's appointed to this case. February 21st, we have opening statements. So he's on the case for five months before he's asked to step up from second chair of counsel to first chair of counsel. But he missed a third of the trial days. You're not contesting that, are you? We didn't contest it below, only because the trial court never really delved into the issue. And that's a record, I mean, I think that's a record issue that the defendant, or Mr. Wilson, has to... Well, there's several things in your brief where you make assertions and then you say the defense didn't contest that below, so we should accept it. So I can't say that in your brief and then say, you know, argue the opposite when it's a defense point, can you? I mean, look, the trial court never made a finding about the one-third, missing one-third. And to be sure, I'm not heavily contesting it now. You left the country during the trial, right, for a funeral? He made that representation. There's no reason to dispute that. I have no reason to dispute that on appeal. But to get back to Your Honor's point about the representation that we made in our brief, I'm not actually sure what Your Honor is referring to specifically. But, again, whether or not we made that representation in our brief or not, here, the trial court never made a specific finding that he was gone for one-third. But our argument does not fall on or rise on that. In fact, I think it was a footnote point that I made in our brief. Who were the most credible defense witnesses in the field? Credible defense witnesses? Yeah, or least credible. Credible or least credible? Yeah, who would you say were the most credible and the least credible defense witnesses? There was eight defense witnesses. Four of them were about the Trayvon Shaw murder. Those four talked about the Trayvon Shaw murder and, in fact, said that David Wilson was not. One of them said that David Wilson was not the shooter. I think significantly that David Wilson was acquitted of that charge. So, clearly, the jury believed those witnesses over the government witnesses about the Trayvon Shaw murder and identified Mr. Wilson as the shooter of Trayvon Shaw. So you're basing that judgment on the outcome? Yes, based on the transcripts. Based on the outcome? How could you, based on reading the transcripts, make an assessment of what witnesses were credible or not? I mean, I think you could look at the transcript and determine whether or not, look at their impeachment, I mean, look at their cross-examination, determine whether or not they admitted they lied, whether or not they fell apart on cross-examination. There's ways that you could look at the transcript and determine whether or not a particular witness was credible or not. Isn't there a lot of case law from this court and the Supreme Court about how, you know, on the cold, dead record, so to speak, courts of appeals shouldn't second-guess trial judges about their assessments of credibility because we weren't there? That's correct, but... Doesn't that apply to Mr. Proctor here? Your Honor, I don't think so because the question is whether or not this court should be presuming prejudice based on Mr. Proctor's having read some portions of the transcripts. I do want to just put another point, which is this. We don't know, and Mr. Proctor never made any representations, that what particular days he missed, right? So even if he missed one-third of the trial as he represented... There was a conviction, you know, an important conviction of the homicide. Right. And it's been represented that he wasn't there on that day. I think we can actually make an assessment of that from looking at the transcript from that day. And that's the first time I've heard of this. I don't recall any representation where Mr. Proctor said, you know, I was not here on... Well, I mean, we went back and looked at the transcripts, my clerk and I, and we could see that there were some days where he clearly wasn't there according to the transcripts, including very important testimony against him. I mean, unless Mr. Wick said, you know, Mr. Proctor is not here today. Well, the court reporter notes who's present and who's not in the courtroom. Each defendant had two attorneys. I'm not sure whether or not every attorney made an announcement of his or her presence every time the case was called. I'm just not clear of that. If I disagree with you and I can look at the transcript and see some days where he's not there, then what's your response? My response is this. And we cite the Snappy-Demorski-Snappy case in which the Supreme Court said, look, the question is not whether a counsel in a particular circumstance will perform less well than he otherwise would, but whether the circumstances are so – and we're talking about the presumption – whether the circumstances are so likely to result in such poor performance that an inquiry into its effect would not be worth the time. We're not saying that the defendant cannot make a stricter claim here, not at all. We're saying that he should at least make a stricter claim. We're just saying that this court should not presume presence on this record. Again, we don't know – another record issue. We don't know whether or not, in response to your honest question to the public's counsel, we don't know whether or not Ms. Witt in the background was assaulted. We know that she never was kicked off the case. In fact, she comes back during closing statements. She comes back during jury notes. We don't know what consultation she was given to Ms. Proctor and Mr. Davis. We do know on July 17th, before the second break, so Mr. Proctor can get ready for the defense case, when Judge Roberts asked for the – how long the timeframe that Mr. Proctor expected Mr. Wilson's defense case to take, they were kind of waffling, and then he said, you know, well, I spoke to Ms. – quote, and this is on page 18654 of the transcript. He says, well, I spoke to Ms. Witt after she was released from the hospital. She did say she's available by phone. And then he says, I'm not certainly going to call her, but she can take calls, I'm sure you know, from you and from Ms. Wilson as far as what she told me. And then Mr. Davis, who's the second counsel that was appointed for Mr. Wilson, said, that is correct. So there is some suggestion in the record that she was given consultation behind the scenes. Her doctor's note, which was read in the record by the trial court, says that she has to be out for work, no work, for two weeks, and that was back in June, and no trial work for six months. So there's no reason to presume here that she was not given a behind-the-scenes consultation. Now, to the extent – But the trial court didn't seem to think that it was relevant, and the government didn't seem to think that it was relevant below, as to how much the defense counsel could or couldn't consult with Ms. Wicks. The only thing that the government said in its argument about why the court should reconsider was, well, he can read the transcripts and come up to speed. And that seemed to be the way that the trial court judged the issue. Shouldn't we at least remand for some fact-finding on that before we just say that we shouldn't presume prejudice? No, Your Honor. Number one, they haven't asked to remand. Number two, again, even if we assume the worst-case scenario, Mr. Proctor cannot talk to Ms. Wicks as much as he wanted to. Here, we think that the transcript was – he said that he was there for a lot of the trial, right, for most of the trial. If it's accurate that he was not there for 130 of the trial, we think that under the case law, there's no case law that says reading a transcript effectively amounts to having no counsel at all. How important is credibility? I mean, I think it is important. I think it is important. Is that the most important issue? Credibility of witnesses? Yeah. Yes, Your Honor. So it's the most important issue, but you can't judge it from a transcript? I never said that you can't judge it from a transcript. Yes, perhaps you can judge it better if you've seen your witness in court, but reading from the transcript, you can tell whether or not a person made inconsistent statements, whether or not they made a speech by their conviction, whether or not they fell apart on a cross-examination. In court, seeing the witness, of course, you may see additional aspects of that person's testimony that you would not see on a transcript. So the Supreme Court said in Wright v. Van Patten that the reason that you presume prejudice sometimes is because there's something that happens in the trial or with the defense counsel that's so likely a prejudice to the defendant that the cost of litigating the effect of that action in a particular case is unjustified. Right. That's the standard for when we presume prejudice. Yes, Your Honor. So credibility of witnesses is the most important thing for the jury, the counsel to be able to assess, to try to figure out their strategy, et cetera, going forward. And the defense counsel has one hand tied behind their back because they missed important parts of reviewing witnesses. Why shouldn't we say that was so likely a prejudice, Mr. Wilson, in this case? We don't want to really try to litigate and figure that out. It's just so likely a prejudice, and that's why we have a presumed prejudice standard. Your Honor, credibility is an extremely important issue. Our only point is that credibility is not only determined, in fact, not probably primarily determined by looking at that witness in court. We can also look at the transcript. If Mr. Proctor did not have the transcripts, we'd be in a totally different boat. Mr. Proctor had the transcripts. He never came back, made a representation to the court. You know, I had these transcripts, but I wish I would have seen this witness testimony because there was something about the way that witness said this in the transcript that it seems like there may have been something that I could have got out of looking at this live witness. And even if he did, why can't he talk to Ms. Witts about that witness or any particular witness? Ms. Witts, do you have any concerns about any particular witness? Did you notice anything? If the court were to presume prejudice here, why not presume prejudice when a defense counsel is taking too many notes and therefore is not looking at the witness during trial? Why not presume prejudice when a defense counsel just blinks for a second and is just worried about family problems as he's looking at the witness but not paying attention for two or three minutes or five minutes? There's no case law, not one case law, that says reading the transcript is not an adequate substitute  So if there was four months of trial and he missed a third of trial and he effectively missed a month of trial being in court, then we shouldn't presume that that would have any impact on his ability to judge the credibility of witnesses during that month of testimony he missed. We shouldn't presume it. That doesn't mean that it wasn't the case. And you can make a strickling standard, but we shouldn't presume it. And I made the point that they have not pointed to any case that applies that sort of presumption. Recently, there's a case out of the Second Circuit that says, there's a case called Griffin from last year, it has the exact example of the Yarner Gang, which is, it wasn't even a second chair counsel, it was a brand new counsel that came in right before closing statements, and he made the closing statements. Now certainly closing statements is all about the trial evidence, it's about the witnesses and the witnesses' credibility. Even there, the court did not apply presumption. That second lawyer wasn't present? Was not present. And that's a case called Griffin out of the Second Circuit of last year. If I could just have just three more seconds on the presumption. So there's five reasons we think that the court should not apply presumption here. Number one, because he was a second chair counsel when he was asked to step up five months into the trial as first chair counsel. Number two, the court granted two continuances amounting to 44 days, so he could get prepared, read the transcripts, talk to other witnesses, talk to Ms. Witts if he wanted to. Number three, there was another attorney that came in, Mr. Matthew Davis, who knew the defendant from Mr. Wilson. He had a prior relationship with Mr. Wilson. And number four, Mr. Brockett prepared well in this case. He presented eight different witnesses, four on the Trayvon Shaw murder, and Mr. Wilson was eventually acquitted of that murder. And then number five kind of flows from the number four, which is Mr. Wilson was acquitted of a lot of charges, very serious charges in this case, including the Quincy Milstead charge in which he solely was charged with, and the Trayvon Shaw murder in which he and Adolph Hall was charged with. So given all this, we don't think this falls into the narrow circumstances that this chronic says this court or any court should presume prejudice, and we ask this court to affirm their convictions. All right. Judge Wilkins in his questions made me think of something. That is, was this actually a four-month trial? I mean, lots of times juries get even up to a week off if the judge has got a conflict or a lawyer's got a conflict. Do we know that the trial was actually going on fully those four months so that one-third is a month? Your Honor, according to my record, when Ms. Swift fell ill on June 21st, it appears that the trial was going on continuously itself, and I have access here, and I think that represents itself as five days. I think the trial was not going on, according to my notes. Okay. However, I actually think that brings up another good point, which is there's four or five other defendants in this case. There was also days in which no evidence was presented against Mr. Wilson. So again, this is why I think it's important that even if this court were to say, you know, one-third is a long time, the record is not clear on what particular days he missed. I mean, he probably missed days in which is probably why he felt comfortable missing those days in which no evidence was presented against Mr. Wilson. We just don't know in this record. It would have helped if you had taken the time to tell us those specific numbers. In other words, how many days the trial was, how many days Mr. Wilson was not involved in the trial testimony and so forth. But we have your argument, so thank you. Thank you, Your Honor. Let's see. Ms. Englert, why don't you take a minute to respond on this issue, and Madam Clerk, if you could give her a minute and then start her six minutes on the next issue. Yes, I would quickly respond to the government's argument that this is not the case where two counsels, although two counsels started, Mr. Proctor was there at the beginning. Again, the circumstances of his appointment, he started right before trial and he was helping, he was assisting Ms. Wicks. There was no amount of additional time that can cure the defect, the defect of missing significant parts of trial. And again, I would refer the court to the sleeping counsel cases where those courts have always said and apply chronic when counsel misses significant parts of the trial. And I think there can't be a dispute here that there were significant parts of the trial that Mr. Proctor missed. You know, whether it's give or take, whether it really was the third or not, maybe it wasn't as much as the third. Certainly, he missed June 13th, where there was an entire day of testimony about the Bradley Middleton murders. This harm cannot be quantified, and it is like the other cases where chronic has been applied, where harm cannot be quantified. And therefore, the prison prejudice standard should apply. All right. I will go on to the next issue, which is the other chronic issue. Essential, in essence, what this boils down to is that a defendant must be tried for what he did and not for who he is. In this case, there were two murders for which Mr. Wilson was not on trial that were admitted into his case as other crimes evidence. And since both of those cases, the Reginald Reed murder and the Sam Phillips murder, regardless of how they came in, whether it's intrinsic evidence or not, in either case would have to be subject to the balancing requirement of Rule 403, and that's where I would like to spend most of my time in argument, but I'd be happy to take questions. And that Rule 403 requires a balancing of the prohibitive value versus the prejudicial effect of the evidence. And prohibitive value is informed by how much, whether that evidence is cumulative and whether there is other, less prejudicial evidence that could be proof of the same fact that the government wants to get in. The Reed murder involved Mr. Wilson, Desmond Thurston, and Bobby Capey. The court allowed admission of this murder because the court found that it showed the development of relationships between the parties, Mr. Wilson, Thurston, and Capey, and it corroborates the defendant becoming a co-conspirator. There was ample other evidence of that fact, if that is what the government wanted to get in. Capey testified extensively, and his testimony included Mr. Wilson and Mr. Thurston's drug activity. He also said in his testimony that he did lots, Mr. Capey did lots of murders with Mr. Wilson and Mr. Thurston, so that if the government wanted to get in, the relationship between these three people and how they, because of this, would enter into the bigger conspiracy for which Mr. Wilson was charged, certainly admitting an entire murder, that of Reginald Reed in this case, was unnecessary and certainly was very prejudicial. In the Phillips murder, there's a similar analysis. The court held that it showed Mr. Wilson's access to and familiarity with weapons. There was so much other evidence about Mr. Wilson and his involvement using guns and the sharing of guns. I would just refer to our opening brief, pages 49 to 50, and the reply brief at page 19, where it brings out some of the places in the transcripts where Mr. Wilson is known to be using or sharing guns, so that the admission of another entire murder was not necessary to show his access to and familiarity with guns. The government, I think, argues in their brief that there was a determination made prior to trial about other crimes evidence, but that during the trial, counsel did not raise these cumulativeness arguments with the court once the evidence started coming in. Is that accurate? And if it is, how should that play into our consideration of the issue? I don't want to misunderstand your question. The cumulative... In other words, the point that you're making now is that there was lots of other evidence that came in about gun possession, so you didn't need to have the homicide. Was that argument ever made at all? And if it was made and rejected prior to trial, was it made during the trial, and should that matter? I am unsure about that specific argument, so I don't want to make that representation to the court. However, on appeal, this court can affirm on any ground supported by the record, and I think the record is very clear that there was ample other evidence about the use of guns and familiarity with guns against Mr. Wilson. And nothing is more prejudicial than a murder, and in this case, two murders were admitted in Mr. Wilson's case to show matters that were easily shown by the other evidence and was already in the record from the other evidence. It was supposedly to show relationships between the alleged co-conspirators, supposedly to show Mr. Wilson's familiarity and access to guns. All of that evidence was already available to the government, and so the district court abused its discretion in admitting the uncharged murders. Good morning, Your Honors. With respect to the Phillips murder, I think it's very clear on this record that the court should not even be resolving this issue or even addressing this issue at all because Ms. Witt clearly waived. She wanted this murder into the evidence. Pre-trial, she contested that there was no need for this evidence. She made a 4-4-4-3 argument, Judge Wilkins, but she did not make, as I read her opposition, she does not make a 4-4-4-3 argument. She doesn't say there's no non-partisan reason for this evidence. She just says in her opposition, and this is document 573 that she follows on November 27, 2006, that it's true prejudice, but she does not say there's other evidence pointing to any other evidence in the record in which there was evidence that Mr. Wilson used or knew how to use a gun. She just said, nevertheless, it was just true prejudice. She joins the co-defendant's motion, though, right? Right, but the co-defendant, yes, she does, but the co-defendant motion does not, Antoine Ball's motion does not specifically speak to Phillips Arteries' murder. I mean, why would it? He had nothing to do with him. He just mentions it as background, but he doesn't specifically object to that, to those murders. However, so she does make a 4-3 objection pre-trial. On February 28, before the Phillips murder, before Larry Brown's testimony, she said the government, luckily, puts on the record that it was willing to pare down the Phillips murder and not refer it to the murder at all. But, and again, I'm referring to page 986, or 87, excuse me, of the transcript. The government, the prosecutor says, we have discussed it, and the government is willing to do that, but my understanding is that for tactical reasons, Mr. Wilson wants to go into the details of the homicide. In other words, didn't want to go into the fact there was a homicide. And going to page 1,000, Ms. Wicks says on the record, yes, I talked to Mr. Wilson about it. I was checked with him again, but the ridiculousness of certain points of Mr. Brown's story, the story about the Phillips murder, his bias against Mr. Wilson, the reason he has such a huge motive to carry further with the government, and that with the government is precisely because of the homicide. In other words, Larry Brown pled guilty to a RICO conspiracy, and one of the racketeering acts was the Phillips murder, so it's going to come out anyway as equally old information. What she said was he, in fact, on her cross-examination of Mr. Brown, she tried to get him to admit that he's the one that, in fact, committed the Phillips murder, and he's blaming it on Mr. Wilson. And so she saw this as heavy impeachment evidence of him. So I guess somewhere between January and February, she changed her mind, and she wanted it to come in. And then on page 1,001, she says, and for those reasons, on Mr. Wilson's behalf, and I quote, even if the government did not want him to go into it, to the Phillips murder, it's the fact of what he pled to in his plea agreement, and that's a huge, huge motive. And again, I quote, so I would undoubtedly go into it, and I think it does matter that someone died. So I actually would argue that had the government said, no, I understand your argument. I understand that you think this is huge impeachment evidence, but I'm not going to allow you to go into it. I would actually argue that that might be there. So I think it's very clear here that she's weighed this argument. They wanted this evidence, and Judge Roberts simply gave them what they wanted. She didn't want the witness to testify about the incident, but once the testimony came in about the incident, which she objected to, then she said that she didn't want to sanitize it. It wasn't shooting, right? No, Your Honor. This discussion that I just read from the transcript actually came in what took place before Larry Brown even testified. So Larry Brown had not even testified about the Phillips murder yet, and the government was saying, you know, I think we can carry it down. We're willing to do that, but for tactical reasons, the defense wants to go into it. And then she represents, yes, we're going to go into it with Mr. Brown, but we think it provides them a huge motive for him to carry it for favor with the government. And, you know, we argue harmlessness. They don't really take an issue with harmlessness. Not in their opening brief, they make a half-hearted attempt, and they're probably going to say why it was not harmless, but Mr. Wilson was charged with so many murders in this case that it's almost laughable to say that these two murders made the difference. This court, in another case, Gary Gregory Wilson, which we cite in our brief, said that we also know that it's harmless because he was actually acquitted of a lot of charges here, including violent charges. He was acquitted of the Trayvon Shaw first-degree murder. He was acquitted of the Quentin Milstead assault with intent to murder. And he was convicted. The only violent crime that he was convicted of was the Sabrina Bradley and Ronnie Miller murder. But even there, the jury said, can we have a revised verdict for him, saying that he's only charged with aiding and abetting? So I think that type of careful consideration shows that the jury was not impulsively just convicting him of all the violent crimes because he was a bad guy because of these two murders. Unless the court has any questions with respect to the Phillips murder, I'll just take 30 seconds, if I may, and just talk about the Reid murder. The Reid murder, I think, is very important because, once again, we have an argument as to why we think there was no specific objection to this murder. And unless the court has any questions with respect to that, I'll just skip that and say what I think is why the court was correct, that this was an astringent evidence, which I think tellingly below, the defense counsel never said that was not astringent evidence. Their claim was a 4-3. They made a 4-3 objection. But below, they never said that was not astringent evidence. This court has said many times in Burwell and Mattis that when you have a conspiracy, a government has considerable leeway, considerable leeway, to bring in other crimes evidence to show the relationship, the trust that these co-conspirators have in the building of this conspiracy. And that's all this evidence shows. And I also think it shows that Mr. Caffey was involved with the Reid murder, and Mr. Caffey was an important government witness. And he was impeached up and down his testimony. And I think he's on the stand for four days. He testified about a lot of crimes that Mr. Wilson committed. So, and he also testified about the confession that Mr. Wilson gave him about the Ronnie Milliton and Sabrina Veroni murder. So the jury is certainly going to wonder, why should we believe him? But this Reid murder shows why the jury partly should believe him. Because there is a relationship of trust, a great relationship of trust, that they committed murders together. Let's take questions. Any other questions, I'll move on. All right. Thank you. Ms. Englert, why don't you do the same thing with this issue. One minute on the rebuttal and six on your brief. I'll be happy to do that. All right. Just very quickly on the other crimes evidence, just so that the court is clear about where we are, certainly there was no waiver of the Sam Phillips murder. Defense counsel objected to any of the incident coming in. But once the trial court ruled that it was coming in, the issue then became, do we need to say that this was a murder? Certainly there was going to be, the shooting was going to come in, the fact that Mary Brown gave Mr. Wilson a gun. Mr. Wilson went up and shot Sam Phillips. The only question then was going to be, is the fact that the person died, is that going to come in? At that point, Larry Brown was going to testify about the shooting, that Mr. Wilson took the gun, walked up to Sam Phillips and shot him. At that point, counsel made the decision to use as much evidence as she could to impeach Larry Brown. And at that point, the fact that Mr. Brown is involved and could be charged with aiding and abetting a murderer becomes very, very relevant to the impeachment of him. And this is what needs to impeach him. Now that Larry Brown is going to bring in this shooting, she now needs to impeach him. And the fact that she wants to use the murder or the fact that the person died as additional ammunition to impeach him does not mean that Mr. Wilson has waived this argument. And again, I would just refer the court to all the evidence that was already in about the conspiracy, about the relationship between the parties, and about Mr. Wilson's use of guns. I'll turn next then to the last issue for argument, and that is the Brady evidence. There were two sets of Brady material that was not disclosed in a timely manner. The first was a police report that was disclosed in the middle of trial that contained a statement from Michael Smith to Bradley Carter. This was significant because Smith was the only surviving witness to the Middleton-Bradley shooting. And he identified Amon Ball and Joseph Jones as the two shooters, which contradicted the government's witnesses who testified that the shooters were Robertson and Drain. And the second item of Brady material were the police reports that named suspects other than Middleton in the prior shooting of Maurice Dolman and his murder. This was significant because the government's theory was that Middleton had killed Dolman and that Wilson killed Middleton to avenge Dolman's death. These items of evidence were not cumulative and they were not discrete pieces of evidence just limited to impeaching the credibility of one witness or one of the government's witnesses. They changed fundamental facts of the government's case and they had very widespread ramifications for the defense strategy. This was information that the defense could not use without an extensive investigation. And I would take the report of the Middleton murder where Michael Smith identifies Amon Ball and Joseph Jones as the shooters. This was disclosed after three months of trial. As defense counsel, getting this evidence, you can't just start throwing these two names out there all of a sudden. In cross-examination, you know, you try to use this evidence in that way. That's not how a defense strategy should work, certainly not in a case of this magnitude. This is something that has to be investigated beforehand to see how much substance there is in these other two suspects. And only then you might have something in your case and some reason for bringing it up. Then you start, you would have it in your opening to plant that seed in the jury's mind. Then you start cross-examining witnesses and the names, those two names are out there. By the time you get to the defense case, there's something there for the defense to present. If this is not the case where you have an isolated police report, you have the police officer up there, you have his type notes, and then you find out that there were some handwritten notes and one or two sentences were missing, that there was a discrepancy. What significance is it that the defense strategy seemed to be to accept that, I guess, the government's version except to say that Wilson wasn't there, that this Brady would be inconsistent with that because it would say we're not accepting the government's version to the different people who performed the shooting and the government wouldn't accept it? Well, imagine how this might affect the jury's assessment of the government's evidence. I understand that the government is saying, well, that statement only goes to who the two shooters were. It doesn't go to who the driver was, and Wilson was supposedly the driver. But think about how this affects the jury's perception of the government's case. If you can't get the identity of the shooters right, why would they convict Wilson as the driver in aiding or abetting? Of course it matters who the shooters are. Of course it matters who Wilson was with at the time of the shooting. And I'd like to briefly get to the other items of Brady, which were the other suspects in the Louise Dolman murder. It was essential to the government's case to show a motive, Wilson's motive for killing Middleton. And that motive was that, according to the government's theory, that Middleton had, in five years previously, had killed Maurice Dolman. These police reports show that it was far from certain that Middleton was the suspect or the person who shot Dolman. At the time of the police investigation, there were, in addition to Middleton, three other suspects that were named as shooters. And so, this goes to the very heart of the government's case against Wilson, which is a motive for him to have shot Middleton. And this is something, again, that cannot be, again, this was disclosed after trial, but it's something that has to be disclosed well before trial to allow the defense to investigate. This Brady evidence put the whole case in a different light that undermined the fairness of the trial. The government says that this is basically irrelevant because it doesn't show what Wilson thought. What's your response to that? I think what the jury heard was, Middleton killed Dolman. No response to that. So, the jury can take it as a given that Middleton killed Dolman. And from that, infer then that whoever cared about Dolman isn't going to like Middleton very much and would have a motive to kill him. Now, if there's other evidence that it's not at all clear who actually killed Dolman, there are other suspects out there. There was word on, well, you know, people thought that there were other people. Nobody really knew who killed Middleton. What if nobody knew who killed Middleton? Well, isn't one of the Brady, wasn't part of the Brady that one of the alleged co-conspirators of your client thought somebody else killed him? Yes, that Mr. Ball, who was one of the lead defendants, thought that someone else had killed Maurice Dolman. And I do think that's significant and that is brought out in the brief that if a close associate of Mr. Wilson thought that there was somebody else who was responsible for this murder, that if the government wants to infer motive, well, it can also be inferred that Mr. Wilson didn't believe that Middleton was the shooter. I would like to conclude by saying Mr. Wilson was convicted of these two murders based on circumstantial evidence. He is now serving a sentence of 30 years to life imprisonment. And this was after he was deprived of the effective assistance of counsel, after the government admitted two uncharged murders, and after the government withheld important Brady information. He knows that his trial was unfair. He prays that this court will reverse his conviction and remand for a new trial. All right, thank you. Mr. Perez? Good morning again, Your Honor. I'll start off with the police reports that Judge Wilkins asked about. We argue that the police reports, the four police reports that were discovered after trial, three of which identify someone else other than Mr. Squid in Dolman's 1993 murder, we argue that those are not exculpatory at all because as the appellant recognizes in his opening brief, the issue at trial was what was Mr. Wilson's belief. That's what motive is all about. What does Wilson believe? Whether or not Middleton in fact killed Dolman was really collateral. It was really beside the point that Judge Roberts recognized and tried to hunt the knee case in the Fourth Circuit that takes that position as well. None of these four police reports, really three only really matter because one of them actually supports the government's theory that Squid was the killer of Maurice Dolman. But none of the three police reports share any light on Mr. Wilson's belief. The first police report that Judge Wilkins referred to about whether or not Antoine Ball, who was the leader of the Congress Spark crew, whether or not he thought, and he being the leader of Mr. Wilson's crew, whether or not that could be inferred or imputed, his knowledge could be imputed onto Mr. Wilson, we don't even think that police report actually says that. And I'm looking at the JA site is 1657 of that police report. And all Maurice Willis, Maurice Willis is the actual witness that the detective talked to. Maurice Willis, mind you, is a part of the 15 mob, a different crew, the rival crew of NCP and Congress Spark. All it says is that the complainant, and it's referring to Mr. Willis, further stated that Maurice, a.k.a. Greasy, was killed, and that Antoine may think that him, him being Willis, and Alfred Holmes were involved in Maurice Dolman's death. All it says is that he may think. It never says that Antoine Ball ever said, you know, I think that you killed him. And so even if we can infer that Antoine Ball's knowledge of who killed Maurice Dolman onto Willis, which I think is a stretch, but even if we can infer that, this police report, again on page 1757, 1657 of the JA, doesn't even support that at all. It's speculation. If we were to have a new trial, Maurice Willis cannot get on the stand and say, Antoine, I think that Antoine Ball thought that speculation would be inadmissible evidence. But the point of Brady isn't that the Brady itself has to be admissible. It's that you get to investigate it because it might lead to admissible evidence, right? I agree with that, Your Honor, but they have not shown on appeal what admissible evidence they would introduce if they were to get into trial, which they haven't shown. So to make a Brady claim, you have to basically, after you get the belated Brady, investigate it and then show what the fruits of your investigation have revealed in order to have a viable Brady claim? Yes, Your Honor. On appeal. On appeal. What case says that? Deere from this court in 1993 says, to be material under Brady, the undisclosed information or evidence acquired through that information must be admissible. They have not shown any admissible evidence here. Because, really, the ultimate question is, if this court were to reverse, what admissible evidence are jury going to set forth in front of the jury to change the jury's mind? And they just haven't done any. Each of the three reports does not, number one, does not favor, does not impeach, does not disculpatory of what the government's theory was of Mr. Wilson's motive, which is his belief, not who in fact killed Doleman. And then the second and third report, I'll just quickly note, again, the second report says that Coulter blames Doleman's murder on, Coulter is a 1-5 mob member, again, blames Doleman's murder on Sean, another 1-5 mob member. Again, another 1-5 mob member, another 1-5, a rifle crew member, thought, cannot be, it's unreasonable to argue that that can be imputable to Mr. Wilson. And then finally, the third report says, Cory Watkins said that Squid, who's the actual guy that the government said, below, that all the 1-1 CP members, Congress department members, thought was the killer of Mr. Doleman, that Squid said, so we've got Doleman here to say that Coulter killed Doleman. Again, so what Squid thinks cannot be imputed, it's not even reasonable to impute that on Mr. Wilson's belief, when they're rifle crew members. I hope that argument came out clearly. With respect to the Tinneyman statement, our argument there is, it's not favorable because it's not a sculpture, it's not a sculpture because it's not admissible evidence. Tinneyman was dead at the time of the trial. They have not set forth any theory in which they could have got this information before the jury. Could there have been some investigation? Perhaps, but it's speculative to say now that their investigation would have led to any admissible evidence. It's not impeaching evidence because Tinneyman did not testify at all, obviously, because he was dead. To the extent that it was impeaching evidence, they could have, they being Mr. Wilson's defense counsel, could have required any witness testimony, and they did not. Why is it necessarily the case that it couldn't have been admissible, you know, in trial court's discretion under the residual hearsay exception? Certainly the statement made for the purposes of identification, Tinneyman's statement to Carter, and then Carter is there, and it's, yes, it's a double hearsay, but at least you can cross-examine Carter about whether Tinneyman made the statement. Under Rule 8 and 7, the residual hearsay exception, the trial court might have said, no, it couldn't come in. There's not a confrontation clause problem with respect to the defendant's right. Two responses, Your Honor. Number one is, in fact, Ms. Wicks actually did try to cross-examine Carter on the, on his statement about, that he gave to the defendant about Tinneyman, and Carter just said, I don't agree with that. And the court also said that, he said he didn't remember, but the court didn't let him go into it completely because he said it was going to be too prejudicial to Jones, who was a co-defendant and who was going to be inculcated by the state board. I thought I had the transcripts, and I'm sure it is somewhere, but the way it went out, the way the discussion came about, Your Honor, is that she tried to get into the statement that Carter gave to Detective Gus about Tinneyman. And at that time, the government made a beyond-the-scope objection because the government had not made any inquiry about that on the direct. And she said, well, I'm just getting into it to show that he was cooperating, it goes to advice to show that he was cooperating with the police all this time. And the court said, okay, you can get into it, but you can't get into the details as to exactly what was said, but you can say whether or not he told Detective Gus that Tinneyman made the statement. And then at that point, then she starts to ask him about this, and he says, no, I don't recall that. And then she says, well, do you recall you and I meeting last week about this statement? And she shows him the statement. Does that refresh your recollection? He's like, no. She said, do you recall talking to Detective Gus? He says, no. So the fact of the matter is that they used the statement, they tried to use the statement to impeach Carter. They tried to get the statement out, and Carter just did not recall. I don't see any other way they could have got the statement in. If there were to be a retrial, there's no reason to believe on this record that Carter would admit something that he didn't admit at the first trial. Tinneyman is not coming back alive. I don't think it falls under the residual exception because we have 803 subsection 3 that specifically talks about statement identification with the court. What Congress says is that to be admissible under the statement identification section to the hearsay rule that, quote, the declarant has to testify and be subject to cross-examination. That didn't happen here. That can't happen here because Tinneyman is on the law. So we think that this case is very much like the Deere case that we cite, too, in our brief, in which you have other statements, out-of-court statements that folks may implicate in someone other than the defendant, but those statements cannot come into trial. Here it's because Tinneyman is dead. There it's because the out-of-court declarant votes. I think it was a hearsay. Even if there was any verdict violations, we think it's very clear that the record is very, very strong here about that Mr. Wilson was involved in the alien event. He made four separate confessions, including one to Renee Cunningham, who was very convincing because she looked at him as a son. She knew specific details about that, about the murder of Tinneyman jumping out the back of the truck. So we think, given all of this, even if there was a verdict violation, even if there was favorable information, there's no prejudice. It wasn't deterred. Does anyone have any questions we ask at the court? Thank you. Let's see. You want to take a minute? I think the government's argument that there was so much evidence against Wilson is, to say the least, a stretch. This was a circumstantial case, and the jury initially indicated that it was hung on the Middleton and Bradley murder counts. This was attempted to use that police report about Michael Smith as impeachment evidence, and that's one way that Brady evidence is relevant, even if the statement itself may not be admissible, but certainly you can use evidence as impeachment evidence. But in this case, it goes beyond that because it's not merely a statement. It's a statement that reveals an entirely different theory for the Middleton-Bradley murder that the defense was unable to investigate because it was disclosed. So wait. And I've already gone into how this should have been and what could have been used by the defense. I would just say in closing that there is an amount that Mr. Wilson was convicted in this circumstantial case after being denied his right to due process and effective assistance of counsel. There was so much evidence that came in that shouldn't have and so much evidence that should have been turned over to the defense that wasn't, and then he was, in the end, represented by a lawyer who said he couldn't effectively represent Wilson. All right. The court then – Mr. Wilson asked that the court overturn his conviction. All right. Thank you. Mr. Bedford? Judge Henderson, members of the panel, good morning. I am Robert Becker. I represent Gregory Bell in this matter and the police and the court. I would like to spend a very brief time on the major sentencing issue in this case, the acquitted conduct, and then move on to Mr. Bell's enhancement regarding the gun. We understand that this panel cannot reverse the holding in Jones. We think it was wrongly decided, and three justices of the Supreme Court have said that it is time for the Supreme Court to address the issue of the relationship between 1B1.3 and Apprendi. Most notable about that is that Justice Thomas, who wrote the Elaine opinion, was one of those justices. And in the opinion, Justice Scalia said, the courts of appeals have uniformly taken our continued silence on this issue to suggest that the Constitution does not permit otherwise unreasonable sentences supported by judicial fact-finding so long as they are within the statutory range. That is at the bottom of the acquitted conduct issue here. And beyond that, unless you have questions, I will move on because, as I said, we would just ask that you agree that we should have a hearing so that this court can address the issue more fully. It would seem, in the overall scheme of things, that Mr. Bell's request that you reverse his two-level enhancement for the gun is insignificant. But it is not. Because under the sentencing guidelines revisions that will take effect later this year, his sentence would be reduced by four levels. That would place the bottom of his guideline sentencing range at 151 months, well below the sub-guideline sentence he received before. He would become eligible for release in November and to release to a halfway house this May. If his sentence were reduced two more points because the gun bump was removed, his sentencing range would become 121 months to 151 months. He will reach the 121 months in April, next month. So this is a significant issue for him. The problem with the gun bump in this case is that Mr. Bell was convicted of three small drug sales in 2000. The basis for adding the two-level enhancement is a gun that was found during a search in 1996 of a house of residence he shared with his father. That gun clearly had no direct relationship to the crimes for which he was convicted. But the court has taken the position, the trial court took the position, that they were part of the conspiracy that was acquitted and therefore they were relevant for sentencing purposes in this context as well. The application notes say, this is note 11A of guideline 2D1.1, is the enhancement should be applied if the weapon was present during the crime of conviction. The crime of conviction was a drug sale or three drug sales in 2000. The question is what is meant by the weapon was present? And this is not, the allocation of these two levels was not based on co-conspirator's conduct. It was not based on his aiding and abetting. It was based on his possession of a weapon at a time four years previous. In a very real sense, the questions here are similar to the question that was raised in Bailey. When this court read 924C as saying simple possession of a weapon during a drug transaction was sufficient to trigger the using or carrying provision of 924C. And the Supreme Court did not agree. It said under those circumstances the gun actually has to be involved in facilitating the crime. The logic behind that provision 924C is that guns increase the dangerousness of the offense, the underlying offense. That's the same logic that the sentencing commission says underlies the gun bump in 2D1.1. And so the Supreme Court said it's got to be actually involved in some way for 924C to come into play. In this context, there has to be some clear link between the gun and the drug transactions to bring 2D1.1's enhancement for guns within the sentencing scheme for this crime. And under the circumstances of this case, that clearly is not here. All right. Thank you. Thank you. Mr. Strang. May it please the Court, Stratton Strand on behalf of the government. As this Court stated in Jones, the as-applied theory that appellants are suggesting this Court go en banc to consider, no Supreme Court majority has ever recognized the validity of it. That's what Jones said. And that continues to be the case because six members of the Supreme Court denied cert in Jones. There's no basis for en banc review of the settled precedence of this and every other Court that has considered the issue. As to the gun bump, Mr. Becker simply misquoted the relevant application note. The application note states, if I may, that the enhancement reflects increased danger of violence when drug traffickers possess weapons and the adjustment should be applied if the weapon was present unless it is clearly improbable that the weapon was connected with the offense. Mr. Becker added with the offense of conviction and that is not language that's in the provision. The provision, it's settled law that specific offense characteristics like the gun enhancement apply to relevant conduct. And relevant conduct is determined on the basis not just of the offenses of conviction but of all of the conduct that is relevant and that the Court specifically found to be relevant. The suggestion that there was no basis for connecting the gun found in this 1996 search of Mr. Bell's bedroom, there's no basis for connecting that to the conspiracy itself, is refuted by the trial court's own careful findings. The trial court noted that the gun was found in Mr. Bell's bedroom during the life of the crack conspiracy. It was found hidden in a closet in proximity to other tools of the narcotics trade. Again, the court specifically was finding that guns as the gun enhancement itself recognized go hand in hand with drug trafficking and the court specifically found that this gun was in fact related to the drug trafficking in which Mr. Bell was involved for the entire period from 1992 through 2003 at the latest. Therefore, there was ample basis for the court's application of the firearm enhancement. If the court has no further questions, we would ask that you affirm the sentences of Mr. Bell and Ms. Wilson. Thank you. Mr. Becker. Thank you. Just to come back to the issue of the offense, I think even with regard to relevant conduct, there needs to be a temporal and real link between the relevant conduct and the crime of conviction. That's what the sentencing gun lets punish is the crime of conviction. And without either a temporal connection or a logical connection here to the crimes for which Mr. Bell was convicted, the gun is not present in this case anymore. The mere fact that it was involved in the conspiracy that was acquitted, if that's the standard that any defendant who is a drug dealer, who has at some time in his past within the time frame of the case when it started, has had a gun, will be penalized under the gun bond regardless of the connection between that gun and the crimes for which the person was actually committed. And that's, I think, a very broad reading of that guideline and is not warranted certainly by the application. Thank you. All right, Mr. Becker and Ms. Engler, you were both appointed by the court to represent your clients and you've done a stable job in the court. Thank you.
judges: Henderson, Brown, Wilkins